**In re PETITION FOR REFERENDUM ON QUESTION OF AMENDING PITTSBURGH HOME RULE CHARTER with Respect to the Powers and Duties of the City Controller.**

**Objection of Thomas E. Flaherty, in his Individual Capacity and as Controller for the City of Pittsburgh.**

**Appeal for Campaign for Responsible Government in Pittsburgh, by Edward S. Kiely, Trustee Ad Litem.**

**The Campaign for RESPONSIBLE GOVERNMENT in PITTSBURGH, by Edward S. Kiely, Trustee Ad Litem, Appellant.**

Commonwealth Court of Pennsylvania.

Argued March 15, 1995.

Decided June 5, 1995.

E.J. Strassburger, for appellant.

David J. Armstrong, for appellee.

Before: COLINS, President Judge, DOYLE, SMITH and KELLEY, JJ., and NEWMAN, Judge.

NEWMAN, Judge.

Edward S. Kiely (Kiely), as trustee ad litem for the Campaign for Responsible Government in Pittsburgh, appeals a decision of the Court of Common Pleas of Allegheny County (trial court) setting aside a referendum petition on the bases that: (1) the petition lacked the required number of signatures pursuant to Section 232 of the Home Rule Charter and Optional Plans Law (Home Rule Charter Law), Act of April 13, 1972, P.L. 62, *as amended,* 53 P.S. § 1–232, and (2) the petition violated the five-year time restriction of Section 218 of the Home Rule Charter Law, 53 P.S. § 1–218.

### FACTS

On August 9, 1994, Kiely filed a referendum petition with the Allegheny County Department of Elections, seeking to transfer the bill paying functions of the Pittsburgh City Controller's office to the Mayor's office; the City Controller's office would retain its auditing functions. Specifically, the referendum provided as follows:

Shall the accounting and auditing functions of the Pittsburgh city government be separated and clarified by amending the Home Rule Charter as follows:

(A) By adding to Article 2, Executive Branch, Section 204, Powers and Duties of the Mayor, the power and duty 'to establish and administer a centralized accounting system in accordance with generally accepted accounting principles';

(B) By eliminating from Article 4, Controller, all accounting and bookkeeping responsibilities by: (1) deleting from Section 404, Powers and Duties, Subsections (a) and (f) through (i); (2) deleting Section 405, Notice of Disapproval; (3) deleting Section 406, Liability; and (4) deleting Section 407, Examination of Claims; and

(C) By adding to Article 4, Controller, Section 404, the powers and duty (1) 'to perform all financial and performance auditing responsibilities in accordance with generally accepted governmental auditing standards'; (2) 'to prepare an annual report on city service efforts and accomplishments and an annual report on the city's financial condition and trends'; and (3) 'to have full access to employees, officials, records and reports; and, if necessary, issue subpoenas to require all branches, departments, and officials of government to produce relevant documents, files and other records'?

Kiely sought to have the question placed on the ballot for the general election of November 8, 1994. Pursuant to Section 232 of the Home Rule Charter Law, a referendum petition that seeks to amend a home rule charter requires the signatures of "electors comprising 10% of the number of electors voting for the office of Governor in the last gubernatorial General Election in the municipality." 53 P.S. § 1–232. Based on this formula, Kiely was required to have 9,300 valid signatures. Kiely's petition had the signatures of approximately 15,000 individuals.

On August 16, 1994, Thomas E. Flaherty (Flaherty), the Controller of the City of Pittsburgh, filed a petition to set aside the referendum. Flaherty raised the following challenges:

(1) The Petition did not contain the requisite number of signatures of qualified electors of the City of Pittsburgh;[1]

(2) The referendum question, if approved, would constitute a change in the form of government which can only be presented to the voters after the election and delib-

---

**1.** Flaherty specifically contended that 8,882 signatures contained in Kiely's referendum petition were invalid. He challenged 6,701 signatures on the basis that they were not the signatures of qualified electors of the City of Pittsburgh, 2,139 signatures on the basis that these purported signatures were of individuals residing outside of the City of Pittsburgh, and forty-two signatures on the basis that they were not properly notarized.

eration of a government study commission;

(3) The signers of the Petition could not have understood its content because the Petition did not contain the text of the sections of the Pittsburgh Home Rule Charter it was deleting and professed to give the position of City Controller powers and duties that it already had under the existing Charter;

(4) Any ballot question stemming from the Petition could not fairly present the issues to the voters in seventy-five words or less; and

(5) The circulators of the petition misled the signers by telling them that the petition would actually enhance rather than seriously reduce the powers and duties of the Controller.

The trial court conducted hearings on September 9, 1994, September 19, 1994, September 27, 1994, and September 29, 1994. By order dated September 30, 1994, the trial court set aside the referendum petition on the bases that: (1) the petition lacked the required number of signatures pursuant to Section 232 of the Home Rule Charter Law, and (2) the petition violated the five-year time restriction of Section 218 of the Home Rule Charter Law because it constituted a change in the form of government. Specifically, the trial court reasoned:

[F]ollowing an exhaustive analysis of the 14,875 signatures gathered by [Kiely], the Court concluded that 9,297 were valid. This leaves the petition three signatures short of the 9,300 required by 53 P.S. § 1–233 to get a referendum question on the ballot.

Perhaps more important, however, is the fact that the proposed referendum is untimely. Section 218 of the Home Rule Charter and Optional Plans Law, 53 [P.S.] § 1–218 provides that:

The voters of any municipality which has adopted a home rule charter or an optional plan of government pursuant to this act may not vote on the question of changing the form of government until five years after the home rule charter or optional plan became effective.

\*     \*     \*     \*     \*     \*

Because the proposed referendum seeks to fundamentally alter the basic distribution of authority among different arms of city government it clearly constitutes a change in the form of government and is subject to Section 218's five year moratorium.[2]

Trial court opinion at 2–3 (footnote omitted). Kiely filed an appeal with our court on October 11, 1994.

### ISSUES

Kiely asks us to review four issues: (1) whether this court has discretion to schedule the referendum for a future election; (2) whether the trial court erred in disallowing certain signatures to which no specific objection was made; (3) whether the trial court improperly placed the burden of proof on the referendum's proponent, rather than on Flaherty; and (4) whether the proposed referendum would violate the statutory proscription against voting on a change in the form of government within five years of the effective date of the last such change.[3]

### DISCUSSION

■  Kiely initially contends that this matter is not moot because the date of the general election (November 8, 1994) has passed without a disposition of the referendum question. Specifically, Kiely contends that "the election machinery in this case has already been set in motion. It would be inequitable indeed to deprive the voters of their franchise because of circumstances and

---

2. The last change of Pittsburgh city government became effective January 1, 1990 and concerned the election of council members by district where they had previously been elected at-large. Thus, according to the terms of Section 218 of the Home Rule Charter Law, the voters of Allegheny County could not vote on any referendum question changing the form of government until January 1, 1995.

3. Our scope of review is limited to determining whether the trial court abused its discretion or committed legal error. *McCaskey v. Allegheny County Department of Elections*, 139 Pa.Commonwealth Ct. 229, 590 A.2d 77 (1991).

delay, which were inherent in the system and beyond anyone's reasonable control." Kiely's brief at 14.

Section 232 of the Home Rule Charter Law governs the procedure for a referendum to be placed on the ballot. The pertinent part of the section provides as follows:

> A petition containing a proposal for referendum on the question of amending a home rule charter *or an optional plan of government* ... shall be filed with the election officials not later than the thirteenth Tuesday prior to the next primary, municipal or general election. The petition and the proceedings therein shall be in the manner and subject to the provisions of the election laws which relate to the signing, filing and adjudication of nomination petitions insofar as such provisions are applicable, *except that no referendum petition shall be signed or circulated prior to the twentieth Tuesday before the election nor later than the thirteenth Tuesday before the election.*

53 P.S. § 1–232 (emphasis supplied).

As provided by Section 232 of the Home Rule Charter Law, a party seeking to place a referendum on the ballot has a limited period in which to act. In the case *sub judice,* Kiely had from June 21, 1994 until August 9, 1994 to obtain the requisite number of signatures. Because of the delay associated with the legal proceedings, Kiely now seeks to have the referendum placed on the ballot for the next available election. However, such action would clearly violate Section 232 of the Home Rule Charter Law because it would require placing a referendum on the ballot that contained signatures that were obtained well in excess of the twenty weeks before the next available election. In effect, Kiely asks us to do what the statute clearly prohibits.

The legislature's intent in fashioning a strict timetable for the obtaining of signatures for a referendum petition is rational. As this case evidences, if we were to place the referendum on the next available ballot, we would circumvent Section 232 of the Home Rule Charter Law's requirement that "electors [must comprise] 10% of the number of electors voting for the office of Governor in the last gubernatorial General Election in

the municipality." The 9,300 required signatures that Kiely was required to get was based on the number of electors for the general gubernatorial election of 1990. The general election of 1994 was also a gubernatorial election. Thus, there is a possibility that the number of required signatures of electors has increased if more Pittsburgh electors voted in 1994. Moreover, another reason for the strict time frame is the reasonable assumption that the signers of the Kiely petition may still not be qualified electors at the next available election.

Kiely maintains that our court can ignore the twenty-week limitation contained in Section 232 of the Home Rule Charter Law in light our court's comments in *Marston v. Kline,* 8 Pa.Commonwealth Ct. 143, 301 A.2d 393 (1973). In that case, three electors brought an action to enjoin a special election to fill a vacancy caused by the death of a state senator. The three electors argued that because of reapportionment, their constitutional rights to equal protection under the 14th amendment of the United States Constitution and the Pennsylvania Constitution were deprived by virtue of the fact that electors of the 26th ward in the City of Philadelphia would vote twice. The electors expressly maintained that their right to be represented by a new senator would be "diluted" when compared with the rights of other electors. In rejecting the three electors' arguments, our court stated, *inter alia,* that:

> when the State's election machinery is already in motion, equitable considerations permit a court to consider the factual circumstances, the mechanics and the complexities of the law. [I]f in the discretion of the court, justice and practical considerations deem it appropriate to proceed with the pending election, the court may permit an election to proceed even though it be technically unlawful or unconstitutional.

*Id.* at 156, 301 A.2d at 399.

Our review of the instant matter leads us to conclude that we cannot disregard the express language of the statute. Unlike the situation in *Marston,* a statute is at issue here. Therefore, we must effectuate the in-

tention of the General Assembly as espoused in the last sentence of Section 232 of the Home Rule Charter Law. *See, Philadelphia Suburban Corporation v. Com.,* 144 Pa.Commonwealth Ct. 410, 601 A.2d 893 (1992), *reversed on other grounds,* 535 Pa. 298, 635 A.2d 116 (1993); *Pennsylvania Retailers' Associations v. Lazin,* 57 Pa.Commonwealth Ct. 232, 426 A.2d 712 (1981). We, thus, determine that the matter is moot.[4]

▆▆▆ Finally, we do not believe that the matter comes within any of the general exceptions to the mootness doctrine. We have consistently stated that we may decide questions that have otherwise been rendered moot where the question presented is of great public importance, involves exceptional circumstances, or is capable of repetition yet escapes review. *Bradway.* This is not the case here.

We believe that our holding today does not preclude future appellate review of questions involving referendums. Section 232 of the Home Rule Charter Law provides that referendum petitions are subject to the election laws that relate to nominating petitions. Section 977 of the Pennsylvania Election Code (Code), Act of June 3, 1937, P.L. 1333, *as amended,* 25 P.S. § 2937, provides that nominating petitions are valid unless within seven days, a petition is presented to a court specifically setting forth objections thereto. Section 977 of the Code further provides that if there is a challenge to the referendum petition, the court shall conduct a hearing no later than ten days after the last day for filing the referendum petition, and the court must finally determine the matter within fifteen days after the last day for filing the referendum petition. Thus, the legislature has provided strict guidelines by which courts must abide when considering various challenges to referendum petitions. Pursuant to this legislative scheme, an appellate court is given ample time (at least ten weeks) to review the matter.

The present matter does not fall within the usual case. Kiely filed his referendum petition on the last possible day, August 9, 1994.[5] Kiely then sought to redeem certain signatures before the trial court, thus, extending the period in which the trial court was required to act. The trial court issued its opinion on September 30, 1994. In its opinion, the trial court definitively set forth the bases for its decision. However, Kiely did not appeal to our court until October 11, 1994. It is clear from these facts that Kiely's actions were a material factor in this case's delay in reaching this court.

### CONCLUSION

Because the instant referendum petition was circulated well beyond the twenty weeks of any forthcoming election, we cannot proceed to the merits of the action. Accordingly, we dismiss the instant appeal as moot.

PELLEGRINI, J., did not participate in the decision in this case.

### ORDER

AND NOW, June 5, 1995, we dismiss the appeal of Edward S. Kiely, as trustee ad litem for the Campaign for Responsible Government in Pittsburgh, as moot.

---

4. The general rule is that an actual case or controversy must exist at all stages of the judicial or administrative process or the matter will be dismissed as moot. *Bradway v. Cohen,* 164 Pa.Commonwealth Ct. 249, 642 A.2d 615 (1994).

5. Section 232 of the Home Rule Charter Law provides that "a petition ... shall be filed with the election officials not later than the thirteenth Tuesday prior to the next primary, municipal or general election." Thus, the last day to file was August 9, 1994.